**LAW OFFICE OF ROOSEVELT N. NESMITH, LLC**
Roosevelt N. Nesmith, Esq.
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
Tel: (973) 259-6990
Fax: (866) 848-1368
roosevelt@nesmithlaw.com

**RUSSEL S. WARREN, JR., ESQ.**
473 Sylvan Avenue
Englewood Cliffs, New Jersey 07632-1234
Tel: (201)503-0773
Fax: (201) 503-0776
mail@RWarrenlaw.com

**GISKAN SOLOTAROFF & ANDERSON LLP**
Catherine E. Anderson, Esq.
11 Broadway, Suite 2150
New York, NY 10004
Tel: (212) 847-8315
Fax: (646) 520-3236
canderson@gslawny.com
*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
DISRICT OF NEW JERSEY

-------------------------------------------------------------------x
JUAN CARLOS MERINO and AGUSTIN MOREL, JR.,
individually and on behalf of all others similarly situated,

                Plaintiffs,

      v.

WELLS FARGO & COMPANY, and
WELLS FARGO BANK, NATIONAL ASSOCIATION,

              Defendants.
-------------------------------------------------------------------x

Case No.:
CLASS ACTION
JURY DEMAND

## **INTRODUCTION**

Plaintiffs, Juan Carlos Merino and Agustin Morel, Jr., bring this action against their

former employer, Defendant Wells Fargo & Company and Wells Fargo Bank, National

Association (collectively, "Wells Fargo" or Defendants) for unpaid overtime wages pursuant

to the Fair Labor Standards Act, 29 U.S.C.§ 201, *et seq.* ("FLSA") and the New Jersey Wage and Hour Law, N.J.S.A. 34:12-5634:11-56a4, *et seq.*, and New Jersey Wage and Hour Regulations, N.J.A.C. 12:56-5.1, *et seq.* Plaintiffs bring this case individually on behalf of themselves, as a collective action under the FLSA, and as a class action under the New Jersey Wage and Law on behalf of all persons who (1) work or have worked for Wells Fargo as hourly employees; (2) have been required to meet quarterly quotas for new accounts; (3) have worked more than forty (40) hours per week; and (4) have not paid overtime wages (the "Class").

## PARTIES

1.     Plaintiff Juan Carlos Merino is a citizen of New Jersey and resides in Hackensack.  From approximately March 2010 through November 2015, Plaintiff Merino worked as an hourly employee at several Wells Fargo bank branches in New Jersey, including the 167 Market Street branch in Paterson, New Jersey, where he worked as a Customer Service Sales Representative and Bank Teller, the 233 Fifth Avenue branch in Paterson, New Jersey, where he worked as a Personal Banker, and the 859 Route 17 Paramus branch where he worked as a Personal Banker.  He was paid at a rate of $15 per hour until approximately February 2013, and paid at a rate of $20 per hour from February 2013 until November 2015.  At each Wells Fargo branch location, Plaintiff Merino was required to meet quarterly quotas for new accounts and was instructed by his managers to use Off Site Sheets in order to solicit new accounts outside of regular bank branch business hours.  Indeed, in order to meet the quarterly new account quotas, the Wells Fargo managers knew, or reasonably should have known, that it was necessary for the hourly employees, including Plaintiff Merino, to solicit new accounts outside of regular bank branch business hours.  Hourly employees who did not meet their monthly new

account quotas were frequently terminated or demoted.  In addition to routinely working a forty (40) hour work week at the Wells Fargo bank branches, Plaintiff Merino spent approximately 15 additional hours per week, every week, outside of normal bank branch business hours soliciting new accounts with the Off Site Sheets.  Plaintiff was not paid overtime wages for his off site work.

2.       Plaintiff Agustin Morel, Jr., is a citizen of New Jersey and resides in Passaic. From October 2012 until August 2014, Plaintiff Morel worked as a Personal Banker at the Wells Fargo branch located at People's Park, 1008 Madison Avenue, Paterson, New Jersey.  Plaintiff Morel was paid at the hourly rate of $19.23 per hour.  Plaintiff Morel was required to meet quarterly quotas for new accounts and was instructed by his managers to use Off Site Sheets in order to solicit new accounts outside of regular bank branch business hours.  Indeed, in order to meet the quarterly new account quotas, the Wells Fargo managers knew, or reasonably should have known, that it was necessary for the hourly employees, including Plaintiff Morel, to solicit new accounts outside of regular bank branch business hours.  Hourly employees, like Mr. Morel, who did not meet their monthly new account quotas were frequently terminated or demoted.  Indeed, in August 2014, Mr. Morel was terminated for failing to meet his new account quota.  Mr. Morel's termination occurred approximately one month after he received an unfavorable review from his manager, Felix Ramirez, for failing to meet his quarterly new account numbers for the quarter ended June 30, 2014.  During this review in July 2014, Plaintiff Morel complained to his manager that other employees who were meeting their quotas were also falsifying accounts.  Within the next month, Mr. Morel was terminated.  In addition to routinely working a forty (40) hour work week at the Wells Fargo bank branch, Plaintiff spent approximately 8 additional hours per week, every week, outside of normal bank branch business

hours soliciting new accounts with the Off Site Sheets.  Plaintiff was not paid overtime wages.

3.     Defendant Wells Fargo and Company is, and at all relevant times has been, a corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Francisco, California.  Wells Fargo and Company is a financial services company with approximately $1.5 trillion in assets.  It provides banking, insurance, investments, mortgages, and consumer and commercial finance through more than 9,000 branch locations nationwide.  It has approximately 265,000 full time employees.

4.     Defendant Wells Fargo Bank, National Association is, and at all relevant times has been, a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota.  Wells Fargo Bank, National Association provides Wells Fargo & Company's personal and commercial banking services and is the principal operating subsidiary of Wells Fargo & Company.

## JURISDICTION & VENUE

5.     Jurisdiction in this case is based on 28 U.S.C. §§ 1331, 1332 and/or 1337.  This action arises under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*  Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  Jurisdiction over the state law claim is pursuant to 28 U.S.C. §1367.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants are authorized to conduct business and have conducted substantial business in this district, have intentionally availed themselves of the laws within this district and are subject to personal jurisdiction in this district.

4

## FACTUAL ALLEGATIONS

7.      Plaintiffs and other members of the Class are persons who: (1) work or have worked for Wells Fargo as hourly employees; (2) have been required to meet quarterly quotas for new accounts; (3) have worked more than forty (40) hours per week; and (4) have not been paid overtime wages (the "Class").

8.      For years, Wells Fargo has imposed unrealistic quarterly new account sales quotas on its hourly employees.  Indeed, it is well known that throughout the country, the Wells Fargo community banking division required its hourly employees to "cross sell," or to push existing customers to open more accounts with Wells Fargo.  Wells Fargo measures cross-selling by the number of products, including accounts and credit and debit cards, which each customer has with Wells Fargo.  Wells Fargo's former Chief Executive Officer and Chairman of the Board of Directors, John G. Stumpf, set the target as eight accounts per customer.  Indeed, in the 2010 Annual Report, Mr. Stumpf touted his cross selling target for Wells Fargo employees as "eight is great."   Mr. Stumpf cited Wells Fargo's cross selling targets as one of the main reasons investors should purchase stock in Wells Fargo.  In an April 2012 conference call with investors, Mr. Stumpf stated "We grew our retail banking cross-sell ratio to a record, 5.98 products."  One year later, in April 2013, Mr. Stumpf stated in a conference call with investors "We achieved record retail banking cross- sell of 6.1 products." In April 2014, Mr. Stumpf stated in a conference call with investors "We achieved record retail banking cross-sell of 6.17 products per household."  In the 2014 Annual Report filed with the Securities and Exchange Commission, Wells Fargo further stated "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers.  Our goal is eight products per household. . . ."

9.      Mr. Stumpf knew, or reasonably should have known, that his cross- selling target for Wells Fargo employees to solicit eight products per household was unrealistic, especially in light of the well-known fact that competitor banks have on average fewer than three accounts per customer.  Nevertheless, senior management in the community banking division of Wells Fargo was instructed nationwide to require their hourly employees to meet these unrealistic cross selling targets.  Wells Fargo management thus imposed quarterly new account quotas on all hourly employees and required employees to use of Off Site sheets to solicit new accounts outside of normal bank branch business hours.  Wells Fargo management also incentivized employees to meet their quarterly quotas of new accounts with monetary bonus payments ranging from $400 to $1,200, and penalizing employees who failed to meet the quotas with demotions or termination.  Indeed, Wells Fargo community banking senior management systematically squeezed its employees to the breaking point in order to meet these unrealistic targets in order to enhance the Wells Fargo stock price, which rose approximately $30 per share during the years during which Wells Fargo imposed the cross-selling quota push.

10.     Wells Fargo senior management placed unrelenting pressure on its hourly paid employees to open numerous accounts per customer, often telling the employees, in sum and substance, to "do whatever it takes to reach their quotas" or to "do whatever you have to do" to meet the quotas.

11.     Wells Fargo management often referred to the beginning of each quarter as "JUMP" week during which hourly paid employees were required to obtain six to eight new accounts for the first day.

12.     However, the quotas imposed by Wells Fargo senior management – as per the requirements of Wells Fargo's former CEO, were not realistic, and certainly were not attainable

during normal bank branch business hours because there was simply not enough foot traffic by customers on a daily basis at the branches.  Thus, employees who did not reach their quotas during normal bank branch business hours uniformly were required by Wells Fargo management to work after hours off the clock without compensation to solicit new accounts.

13.     Each day at the end of normal bank branch business hours, Wells Fargo management would circulate "Off Site Sheets" to its hourly paid employees and would instruct the employees to take their "Off Site Sheets" with them after work to solicit new accounts.  The "Off Site Sheet" was basically a pre-approved account application which simply needed to be signed by the customer and then scanned by the Wells Fargo banking branch the following business day.   In addition to passing out the Off Site Sheets at the end of the day, Wells Fargo management also provided the hourly paid employees with Wells Fargo bags for carrying the Off Site Sheets, paper clips, pens and Wells Fargo brochures when they solicited new customers outside of the bank branches after normal business hours.  The Off Site Sheets were maintained on Wells Fargo's website www.wellsfargo.com/teamworks.  Plaintiff Merino and other hourly paid employees at Wells Fargo often referred to the "Off Site Sheets" as their "homework", because it was something they were required to do every day outside of normal bank branch hours.  By name and design, the "Off Site Sheets" show that Wells Fargo management knew that Plaintiffs and the other members of the Class were working several hours each day off site and off the clock outside of the standard forty hour work week at the banking branch.

14.     At the beginning of each day, management would collect the Off Site Sheets from Plaintiffs and the other hourly paid employees.  Wells Fargo company policy also required District Managers to have a "huddle" with the hourly paid employees each morning during which the hourly employees were required to state the number of "solutions" they were going to

obtain that day.  If the employees did not meet their daily target of "solutions" during normal business hours at the bank branch, then they were required to do so off site after normal business hours.

15.     Wells Fargo management also pressured Plaintiffs and the other hourly paid employees to solicit friends and family members to sign up for accounts in order to meet their quotas.  Much of the "friends and family" solicitations occurred after normal bank branch business hours and at social gatherings.  Indeed, some Wells Fargo employees have reported that "they spend holiday dinners trying to convince family members to sign up for accounts."

16.     In accordance with Wells Fargo's company requirements, Plaintiff Merino routinely worked off site and off the clock approximately 3 hours each day, or approximately 15 hours each week, to solicit new accounts and routinely solicited potential new customers at the gym, at social events, at family gatherings, and through his personal contact lists after normal bank branch business hours.   Similarly, Plaintiff Morel worked approximately 8 hours off site every week to solicit new accounts and often solicited potential new customers at the barber shop, the mall, and social gatherings after normal bank branch business hours.  Plaintiffs and the other members of the Class, however, were never compensated for the time they spent soliciting and obtaining new accounts for Wells Fargo off site and outside of the normal bank branch business hours.

17.     Plaintiffs and the other members of the Class are or were non-salaried, non-exempt employees of Wells Fargo.  Indeed, on the rare occasion that either of the Plaintiffs or the other members of the Class worked less than forty hours at the Wells Fargo bank branch in any given week, then they were paid only for the actual hours worked at the Wells Fargo bank branch.  They were never compensated for the off site and off the clock work which they were

required to perform by management.

18.     Despite knowing that Plaintiff and other Class members were working hours off site in addition to working a forty hour week at the Wells Fargo bank branch, Wells Fargo management never instructed or permitted Plaintiff and the other Class members to enter their off site solicitation time into their weekly hourly reports on Time Tracker.  To the contrary, at certain times during his employment with Wells Fargo, Plaintiff Merino was instructed by management to enter only up to, and not in excess of, 40 hours per week in the Time Tracker log.

19.     Wells Fargo monitored daily sales quotas nationwide from each bank branch. Wells Fargo required its hourly paid employees to report the number of "solutions", or new banking accounts and credit or debit cards, obtained at the end of each day.   From Monday through Friday, at the end of each day, the District Managers would have a conference call during which they would report their "solutions" numbers to the Regional Managers.  On Saturday mornings, each bank branch was required to email their "solutions" numbers to the Regional Managers.

20.     When hourly paid employees failed to meet their quarterly quotas for new account openings, they were severely reprimanded.  First, they were placed on warning.  If they continued to fail to meet their quarterly quotas for new accounts, the Wells Fargo hourly paid employees were demoted and/or terminated.   Indeed, in or around April 2014, Plaintiff Morel had a quarterly review with his manager, Felix Ramirez.  Plaintiff Morel had not met his quarterly new account numbers for the quarter ended March 30, 2014.  During his review, Plaintiff Morel informed his manager that the quarterly new account numbers were unrealistic and unattainable and that Wells Fargo needed to change its policy.  Plaintiff Morel explained to

9

his manager that the Wells Fargo target of opening eight "solutions" per customer was financially disadvantageous to many customers at the Paterson branch. Plaintiff Morel told his manager that a good majority of the Wells Fargo customers at the Paterson branch had a very modest or low income and that they were not able to maintain multiple minimum balance requirements of more than one account. As a result, fees and service charges for insufficient balance requirements were being charged to many Wells Fargo customers of modest or low income status. Plaintiff Morel also witnessed elderly Wells Fargo clients on fixed income being "bamboozled" into opening credit card accounts which they did not need in order to meet the Wells Fargo target of eight "solutions" per customer. After this review, Plaintiff Morel was frequently reprimanded by his manager, Mr. Ramirez, for failing to make a sale or open a new account. Mr. Ramirez also threatened to terminate Plaintiff Morel if he did not meet the new account numbers and became physically aggressive towards Plaintiff Morel. Plaintiff Morel often voiced his opinion to his manager that he was not going to force a product on people who did not need it. In response, his manager told Plaintiff Morel that "you got to do what you got to do." When Plaintiff Morel failed to meet the quarterly new account numbers for the quarter ended June 30, 2014, he met again with his manager, Mr. Ramirez, in July 2014. During this meeting, Plaintiff Morel informed his manager that the sales targets were unrealistic and that he had witnessed employees forging accounts in order to meet the quotas. The next month, in August 2014, Plaintiff Morel was terminated by Wells Fargo, ostensibly for failing to meet his quarterly new account numbers.

21.     In pursuit of its unrealistic cross-selling targets imposed by former Wells Fargo CEO Stumpf, and implemented nationwide through the Wells Fargo Regional Managers, Wells Fargo knowingly failed to pay Plaintiffs and other members of the Class overtime pay for the

hours they worked over 40 hours per week off-site and off the clock.  Instead, Plaintiffs and the Class members were only compensated for the forty hours they worked in the bank branch offices of Wells Fargo at their standard hourly rates.

## COLLECTIVE ACTION ALLEGATIONS

22.     Plaintiffs incorporate by reference the foregoing allegations as if set forth herein.

23.     Plaintiffs bring this action individually and as a representative for a collective action under the FLSA on behalf of all persons working for Defendants at any time during the period from three years of the date of the filing of Plaintiff's complaint and who meet the definition of the putative class members set forth above.

24.     Plaintiffs and the other members of the Class are similarly situated, and Plaintiffs will prosecute this action vigorously on behalf of the Class.

25.     Plaintiffs, through their counsel, will file a request under 29 U.S.C. Section 216 for this Court to provide other similarly situated current and former workers with notice and an opportunity to opt-in to this proceeding and to be subject to this Court's decision, or that of the fact finder, on the right to the wages and overtime described above.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs incorporate by reference the foregoing allegations as if set forth herein.

27.     Plaintiff Merino brings this action individually and in a representative capacity on behalf of a class of persons who have worked for Wells Fargo in New Jersey and who meet the definition of the putative class members set forth above during any time in the two years prior to the date of filing Plaintiffs' complaint.

28.     There are at least 100 persons, if not more, in the Class (the exact number will be in Defendants' records), and the Class is so numerous that joinder of all members is impracticable.

29.     Defendants have engaged in the same conduct towards Plaintiff Merino and the other members of the Class.

30.     The claims, defenses, and injuries of Plaintiff Merino are typical of the claims, defenses, and injuries of the class, and the claims, defenses, and injuries of the class members within the class are typical of those of the entire class.

31.     The injuries and damages to the Class present questions of law and fact that are common to each class member within the Class, and that are common to the Class as a whole

32.     Plaintiff Merino will fully and adequately protect and represent the class, and all of its putative class members.

33.     The identity of all members of the class cannot be determined at this time, but will be so determined at a later time upon obtaining discovery from Defendants and others.

34.     The prosecution of separate actions by each member of the Class would create a substantial risk of inconsistent or varying adjudications with regard to individual members of each class that would establish incompatible standards of conduct for Defendants.

35.     The maintenance of a class action is the superior means of disposing of the common questions which predominate herein.

<u>**COUNT ONE**</u>

**Violation of Fair Labor Standards Act ("FLSA")**
**(Collective Action)**

36.     Plaintiffs incorporate the foregoing allegations as if fully set forth

herein.

37.     Defendants are "employers" covered by the minimum wage and overtime requirements set forth in the Fair Labor Standards Act ("FLSA").

38.     As hourly paid employees for Defendants, Plaintiffs and the Class have worked in excess of the maximum weekly hours permitted under the FLSA, but were not paid overtime for those excess hours.

39.     Plaintiff and the Class do not qualify for any exemption from the minimum wage and overtime obligations imposed by the FLSA.

40.     Throughout Plaintiffs' and the Class members' employment, Wells Fargo has known that Plaintiffs and the Class were hourly paid employees who were required to solicit new accounts outside of regular bank branch business hours using the Wells Fargo Off Site Sheets in order to meet the quarterly new account quotas.  Wells Fargo also has known that it is required to pay overtime wages at the rate of time and a half to Plaintiffs and the Class for hours worked over 40 in any week.  In spite of such knowledge, Wells Fargo willfully have withheld and failed to pay the overtime compensation to which Plaintiffs and the other members of the Class are entitled.

41.     Pursuant to the FLSA, Plaintiffs and the Class are entitled to unpaid overtime at a rate of one and one half times their hourly wage. Because Wells Fargo's failure to pay such wages was willful pursuant to 28 U.S.C. § 255(a), Plaintiffs and the Class are entitled to these wages dating back three years.

42.     The identity of all Class members is unknown at this time, but is known to Wells Fargo, and is set forth in Wells Fargo's records.  Plaintiffs are entitled to review these records and identify the other members of the Class who have a right to be provided with

notice and an opportunity to join this collective action.

43.    The exact amount of compensation, including overtime compensation that Wells Fargo has failed to pay the Plaintiffs and the Class is unknown at this time, as many of the records necessary to make such precise calculations are in the possession of Wells Fargo, or were not kept by Wells Fargo.

44.    The FLSA requires employers to make, keep, and preserve records of the wages, hours, and other conditions and practices of employment, and to preserve such records. Plaintiffs and the Class are entitled to review their records of hours worked and new accounts solicited each quarter in order to determine the exact amount of overtime wages owed by Wells Fargo. Absent Wells Fargo's keeping these records as required by law, Plaintiffs and the Class are entitled to submit their information about the number of overtime hours worked.

45.    Wells Fargo's failure to pay Plaintiffs and the other Class members compensation in accordance with the lawful overtime rates is not based on good faith or reasonable grounds, or a belief that such failure is not in violation of the FLSA. Therefore, pursuant to 29 U.S.C. § 216(b), Plaintiffs are entitled to liquidated damages in an amount equal to the compensation and/or overtime which they have not been paid.

46.    Plaintiffs have been required to file this action as the result of Wells Fargo's actions in failing to pay proper compensation. As such, Plaintiffs are entitled to attorneys' fees and costs incurred pursuant to 28 U.S.C. § 216(b).

## COUNT TWO
### Violation of the New Jersey Wage and Hour Law
### (Class Action)

47.    Plaintiff Merino incorporates the foregoing allegations as if fully set forth herein.

14

48.     Wells Fargo is an employer covered by the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a(1)(g).  The overtime wages sought by this claim are "wages" as defined by N.J.S.A. 34:11-56(a)(1)(d).  Throughout the relevant period. Wells Fargo has been subject to the New Jersey Wage and Hour Act and the enabling Regulations noted here.

49.     As hourly paid employees for Wells Fargo, Plaintiff Merino and the other members of the Class routinely worked overtime to solicit new accounts using the Off Site sheets, but were not paid at a rate of time and a half for all hours worked in excess of forty hours per week in violation of N.J.S.A. 12:56-6.1 *et seq*.

50.     Plaintiff Merino and the Class do not qualify for any exemption from the wage and overtime requirements of the New Jersey Wage and Hour Law.  They were subject to pay deductions that remove these exemptions and they do not otherwise meet the requirements of exempt status.  See N.J.S.A. 34:11-56(a)(4).

51.     The exact amount of compensation, including overtime compensation that Wells Fargo has failed to pay Plaintiff Merino and the putative New Jersey class members is unknown at this time, as many of the records necessary to make such precise calculations are in the possession of Wells Fargo, or were not kept by Wells Fargo.

52.     The New Jersey Wage and Hour Law requires employers to make, keep, and preserve records of the wages, hours, and other conditions and practices of employment, and to preserve such records. Plaintiff Merino and the Class are entitled to review their records of hours worked off site to determine the exact amount of overtime wages owed by Wells Fargo. Absent Wells Fargo keeping these records as required by law, see N.J.S.A. 34:11-56(a)(20), Plaintiff Merino and the Class are entitled to submit their information about the number of hours worked.

53.     Wells Fargo's failure to pay Plaintiff Merino and the Class overtime wages at a rate of time and a half the regular hourly wage for each hour of working time in excess of 40 hours in any week was willful within the meaning of the New Jersey Labor Law.  See N.J.S.A. 34:11-56(a)(40).

54.     As a result of Defendants' willful and unlawful conduct, Plaintiff Merino and the New Jersey class is entitled to an award of damages in an amount to be determined at trial, plus liquidated damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request judgment against Defendants as follows:

a       a declaration that Defendants' conduct is in violation of the Federal and New Jersey State labor laws;

b.      compensatory damages, including minimum wage and overtime pay;

c.      liquidated and punitive damages;

d.      certification of a Class on behalf of the New Jersey workers under the New Jersey Wage and Hour Law;

e.      pre-judgment interest;

f.      attorneys' fees and costs;

g.      a right to trial by jury on those claims where jury trial is permitted; and

h.      any such further relief as may be just and proper.

Plaintiffs demand a trial by jury as to all claims so triable.

Dated: October 25, 2016

**By:**  s/Roosevelt N. Nesmith
            Roosevelt N. Nesmith

**LAW OFFICE OF ROOSEVELT N. NESMITH, LLC**
Roosevelt N. Nesmith, Esq.
363 Bloomfield Avenue, Suite 2C

Montclair, New Jersey 07042
Tel: (973) 259-6990
Fax: (866) 848-1368
roosevelt@nesmithlaw.com

**RUSSEL S. WARREN, JR., ESQ.**
473 Sylvan Avenue
Englewood Cliffs, New Jersey 07632-1234
Tel: (201)503-0773
Fax: (201) 503-0776
mail@RWarrenlaw.com

**GISKAN SOLOTAROFF & ANDERSON LLP**
Catherine E. Anderson, Esq.
11 Broadway, Suite 2150
New York, NY 10004
Tel: (212) 847-8315
Fax: (646) 520-3236
canderson@gslawny.com

*Counsel for Plaintiffs*